UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

In re:

MARS FX US LP

                                      Debtor.

-----------------------------------------------------------------x

Chapter 11

Case No. 26-22287 (KYP)

**DECLARATION OF LUKE FURLER,
CHIEF RESTRUCTURING OFFICER, UNDER LOCAL
RULE 1007-2 IN CONNECTION WITH CHAPTER 11 FILING**

Luke Furler, declares pursuant to 28 U.S.C. § 1746 as follows:

1.     I am the chief restructuring officer (the "CRO") of Mars FX US LP (the "Debtor") and one of the Joint Official Liquidators of Mars FX Master Ltd (the "Master Fund"), and MARS FX INTERNATIONAL LTD (the "Offshore Feeder" and, together, with the Master Fund, the "Cayman Entities").

2.     I am a Managing Director of the Restructuring & Insolvency team and Head of International at the financial restructuring firm Quantuma and specialize in large and complex restructuring engagements in Asia. I am regularly appointed as a chief restructuring officer, am a licensed insolvency practitioner, hold multiple Chartered Accountant designations, and take formal appointments in Singapore, Hong Kong, Labuan, and the Cayman Islands.

3.     I have significant experience serving in executive and advisory capacities for distressed entities, including managing complex, multi-jurisdictional matters that intersect with the U.S. Bankruptcy Code, including several matters where I have overseen cross-border restructurings, Chapter 11 reorganizations, and Chapter 15 recognition proceedings.

4.     I make this declaration based on my personal involvement in these matters, my review of the books and records presently made available to me by the General Partner, and discussions with the Debtor's advisors and other relevant persons. Where I refer to matters not

1

within my direct personal knowledge, I do so based on the materials provided to me in the course of these matters.

5.     I submit this declaration in support of the filing of the Debtor's voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") and pursuant to Federal Rule of Bankruptcy Procedure 1007 and Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (collectively "Rule 1007").  Attached hereto as **Exhibit A** are schedules setting forth certain of the specific information required by Rule 1007.

6.     This declaration is intended to provide the Court with the factual background necessary to evaluate the filing and the Debtor's need for chapter 11 protection. It is intended to provide sufficient context at the outset of the case, rather than a complete account of every matter that may later bear on the Debtor's affairs.

7.     The records presently available to me remain incomplete in certain respects, and information regarding the Debtor's creditors, investor positions, and broader liability profile remains under development. Certain matters described in this declaration are therefore preliminary.

### BACKGROUND

8.     Notably, Novus Capital Partners LLC ("Novus" or "General Partner"), the General Partner to the Debtor, determined it was necessary to appoint an experienced restructuring and insolvency professional as CRO and authorized representative of the Debtor in connection with restructuring the Debtor, including without limitation to filing Chapter 11 proceedings. The General Partner considered it appropriate to appoint me to the role of CRO. Attached hereto as **Exhibit B** is the resolution of the General Partner appointing the CRO and authorized representative dated March 16, 2026 (the "General Partner Resolution").

9.      Management of the Debtor's assets, affairs and operations is vested in the General Partner under the Amended and Restated Partnership Agreement dated February 7, 2024 (the "Partnership Agreement"). The Partnership Agreement permits the General Partner to delegate responsibilities by contracting with other persons, which allows for the appointment as a CRO including for the purposes of filing and administering Chapter 11 proceedings.

10.     On March 23, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtor is authorized to continue to operate and manage its business and property as a debtor in possession under Bankruptcy Code sections 1107(a) and 1108.

**Nature of Debtors' Business and Assets**

11.     The Debtor is a Delaware limited partnership. Its registered office is c/o United Agent Group Inc., 1521 Concord Pike, Suite 201, Wilmington, Delaware 19803.

12.     The Debtor, as the "Onshore Feeder," was the vehicle in the U.S. as part of a cross-border investment structure comprised of the Debtor and the Cayman Entities. This structure was established to raise capital from U.S. investors through the Debtor, and non-U.S. investors through the Offshore Feeder, for foreign exchange trading.

13.     Additionally, the Debtor owns 75.64% of the Master Fund according to a shareholding register dated January 31, 2025.

**A.      The Debtor's Operational Structure**

14.     A basic corporate structure diagram is annexed hereto as **Exhibit C**.

15.     The Debtor is operationally and commercially intertwined with the Cayman Entities and as such, in addition to Novus being the General Partner of the Debtor, Novus acted as

3

the investment manager of the Cayman Entities. Notably, Novus is controlled by members David Choi, Ashish Patel, Patrick Hofman, and Jae Choi, each with a 25 % membership interest.

16.     The Debtor and the Cayman Entities are joint claimants in ongoing proceedings brought against Tech RealFX Ltd ("TRFX") in the British Virgin Islands (BVIHC (COM) 2025/0283) seeking recovery of the Debtor's and the Cayman Entities' combined alleged platform position (the "Platform Balance" or the "BVI Proceedings").

17.     The BVI proceedings allege that between August 3, 2020 and August 1, 2024, the Debtor and the Cayman Entities collectively invested approximately $277,371,000 into the TRFX trading structure (the "TRFX Investment Amount").

18.     On November 11, 2024, a withdrawal request was submitted to TRFX and Labuan-registered 4XHUB Limited ("4XHUB") in relation to the TRFX Investment Amount, which, inclusive of purported profits, amounted to approximately $566,730,000 which was claimed as the outstanding Platform Balance at that date, and is consequently the amount claimed in the BVI Proceedings.

19.     The materials available to me indicate that capital was raised through the Debtor and Offshore Feeder and ultimately deployed into the same trading arrangement. The funds were understood to be channeled from the Debtor and Offshore Feeder through various accounts and ultimately to accounts held by TRFX.

20.     The bank-account materials on file identify accounts in the name of the Debtor at JPMorgan Chase Bank in New York, and The Northern Trust International Banking Corporation ("Northern Trust") in New Jersey. The Debtor transferred $122,336,000 from these accounts to Bank of Communications (Hong Kong) Limited ("BOCOM") between 2 August 2020 and 25 February 2025. From 7 April 2022 to 1 August 2024, the Debtor transferred $131,250,000 from

4

Northern Trust to accounts held with Legacy Trust Company Limited ("Legacy Trust") in Hong Kong.

21. It is understood that the funds then flowed from BOCOM and Legacy Trust to TRFX accounts, also in Hong Kong.

22. The flow of funds thereafter from the TRFX accounts is to be confirmed, however preliminary investigations suggest that certain balances to which the Debtor and the Cayman Entities may be entitled are held at broker accounts in the names of TRFX and associate entities, 4XHUB and Treal Capital Limited ("Treal").

23. Broker accounts in the names of TRFX, 4XHUB and Treal were held at Equiti Capital UK Limited ("Equiti") in the UK and GO Markets Pty Ltd ("GO Markets") in Australia (the "Broker Accounts").

24. Investigations are being undertaken as to the entity which held beneficial ownership of the TRFX accounts with BOCOM and Legacy Trust in Hong Kong, and with Equiti and Go Markets. This is due to there being identically named companies for TRFX and Treal in BVI and Hong Kong, and for 4XHUB in Labuan and Hong Kong.

25. TRFX, 4XHUB and Treal are all understood to be ultimately controlled by an individual named Mr. Tan Jit Chun ("Mr. Tan") through direct and indirect (via his wife, Mrs. Ing Yong Wee) ownership and directorships.

26. Trading from the Broker Accounts was understood to take place through a technology platform operated by TRFX.

27. Annexed hereto as **Exhibit D** is a chart summarizing the interaction of the principal entities described above. The chart highlights how the funds flow of the Offshore and Debtor are

5

intertwined, and the jurisdictional breadth of the chain of custody, including across the United States, Cayman, the British Virgin Islands, Hong Kong, Labuan, the UK, and Australia.

**B.      Service Providers and Custody Discrepancies**

28.     The BVI Proceedings also highlight further issues in identifying the legal custodian of the Platform Balance. The rights to the Platform Balance are understood to have been subject to an assignment agreement which affects the recovery of such amounts.

29.     In this regard, the rights to the Platform Balance are understood to have been assigned to 4XHUB in accordance with an assignment agreement dated 7 February 2024 between Novus, the Master Fund, TRFX and 4XHUB (the "Assignment Agreement"), with such funds not moving to 4XHUB in practice.

30.     In addition, there are also unresolved questions as to the website domain which hosted the trading platform and through which clients could invest and monitor their investments. The domain appears to have moved from TRFX to another entity (the identity of which is to be confirmed) in or about October 2022, which is suspected to have potentially impacted oversight and control of the trading platform.

31.     Different parties have advanced materially inconsistent accounts regarding authority and operational control. By way of example, the BVI Proceedings allege that an individual named Mr. "Jackie" Chong Cheong Sin ("Mr. Chong") acted for TRFX in documenting the relevant arrangements (including the trading platform and direction of funds), while TRFX denies that he had authority to act on its behalf, and denies that it received or held client monies. This has a bearing on records recovery, clarification of the custody chain, and the controlling parties at the relevant times.

6

32.     The Debtor and Cayman Entities also share overlapping counterparties, service providers and records. For example, the Debtor and Cayman Entities were both audited by U.S. and Cayman member firms of Deloitte & Touche LLP ("Deloitte") and administered by subsidiaries of Krypton Fund Services Ltd ("Krypton").

33.     The Debtor's relevant records are dispersed across multiple third parties, which are required to provide insight into the financial affairs of the Debtor and the Cayman Entities. Krypton, as the administrator, is a potential source of investor, capital-account and redemption information. Deloitte member firms in the U.S. and Cayman are a potential source of audit files, broker confirmations and related correspondence. Corporate service providers are likely sources of formation, governance and statutory records. Equiti and GO Markets are expected to hold broker-side records. BOCOM and Legacy Trust are key sources for transfer records. TRFX, 4XHUB, Treal, and current or former advisers may hold platform records, statements, onboarding material and related communications.

34.     It is intended to take material steps to obtain such information to assist in the recovery process.

**C.     The Debtor's Current Financial Position**

35.     The materials presently available to me do not permit a clear reconciliation between historic transfers, recorded fund positions, and presently recoverable assets. The recorded Master Fund position and the broader amounts said to be outstanding depend on upstream statements and platform-related records within a structure where the reliability of certain balances remains subject to further investigation. The present asset picture is therefore provisional.

36.     I have reviewed the 2022 and 2023 audited financial statements for the Master Fund and the Debtor, which received unqualified independent auditor's reports on March 24, 2023, and

7

May 16, 2024, respectively. Their respective reported assets and liabilities are summarized in the table below.

| Entity | Asset Description | 2022 Balance (US$) | 2023 Balance (US$) |
|---|---|---|---|
| Master Fund | Total Cash at Bank & Broker | 248,090,013 | 381,349,989 |
| | Cash with Broker | 248,088,535 | 381,345,911 |
| | Cash at Bank | 1,478 | 4,078 |
| Debtor | Investment in Master Fund (Fair Value) (which is reflected in the Master Fund Total above) | 207,345,265 | 325,273,394 |
| | Cash at Bank | 8,557,855 | 7,323,213 |

37.     These audited balances do not establish present recoverability, rather they show the scale of the upstream balances that were being reported and reflected in clean audited financial statements before the present disputes were crystallized.

38.     We understand the engagement letter for the 2024 audit was not signed by both parties and the audit was never completed.

39.     Based on my review of the materials presently available to me, the clearest current upstream position data for the Debtor appears in the shareholder register of the Master Fund dated January 31, 2025. That register records the Debtor as holding 1,464,828.2367 Class A shares in the Master Fund at a stated NAV price of $296.4860 per share, for a recorded value of $434,301,015.57, representing 75.64% of the Master Fund.

40.     As noted, the latest figure for the Platform Balance is approximately $566,730,000 as claimed as outstanding in the Withdrawal Request dated November 11, 2024.

41.     I have also since received an investor register for the Debtor as of 31 January 2025. That register records 535 investor positions in the Debtor with an aggregate recorded NAV of approximately $432,629,274 as at that date.

8

42.     The investor-notices I have reviewed indicate that in late January 2025, investors were told that the Debtor and the Cayman Entities could no longer operate in the normal course and that wind-down steps were being taken.

43.     The financial picture is incomplete in several important respects. I do not presently have a reconciled withdrawal schedule for the Debtor, or a complete standalone balance sheet. Further information still needs to be recovered from third parties and it appears that the Debtor may require several Rule 2004 subpoenas to obtain the necessary information.

44.     I do not presently have direct access to complete bank records, a current cash ledger, or a final cash reconciliation for the Debtor, and I therefore cannot state precisely what cash, if any, is immediately available. The current materials identify bank and trust accounts historically associated with the Debtor and record substantial historic transfers, however they do not presently establish readily available unrestricted liquidity sufficient to fund urgent preservation, control, and recovery steps.

45.     The creditor and liability picture remains under development. One issue identified in respect of the creditor position is whether investors with pending withdrawal requests should be treated as creditors or continue to be treated as limited partners. We do not currently have the withdrawal requests, investor notices, and underlying registers necessary to reconcile this position.

46.     The Top 20 unsecured creditors list submitted as Exhibit A has accordingly been prepared on the basis of the Debtor's presently available books and records, including the investor register and the withdrawal and distribution data presently available to me, and may require further review or amendment as additional information is obtained and reconciled.

47.     As a result of the above, I am not in a position to offer a final solvency opinion for the Debtor. However, the materials give rise to serious concern as to the Debtor's present liquidity, its ability to continue in the ordinary course, and its balance sheet solvency.

48.     The presently available materials indicate that broker-side balances may have been held in accounts standing in the names of TRFX, 4XHUB or Treal, while being represented as held for the benefit of the Master Fund and, indirectly, the Debtor. The disconnect between legal account name and asserted financial entitlement is a central issue to be reconciled.

49.     The Master Fund has informed various regulators of the disconnect of the account names and custody chain and requested assistance in that regard. We continue to pursue options to coordinate with regulators.

50.     The information gaps explained above are part of the Debtor's present financial distress with which such Chapter 11 proceedings would assist, providing court protection and an orderly process for stabilization, investigation, and claims preservation.

**The Decline in the Debtor's Business**

**A.      The Debtor's Investment and Withdrawal Issues**

51.     From 2020 onward, substantial sums associated with the Debtor were transferred, on behalf of the Master Fund, into the trading arrangements then said to be in place with TRFX. Those transfers were initially made to an account at BOCOM and later through Legacy Trust.

52.     In early 2024, management came to understand that TRFX was not a regulated entity. On 18 January 2024, 4XHUB was presented as a regulated alternative, and on 6 February 2024, the aforementioned Assignment Agreement was entered into in connection with an intended shift of the claimed platform position.

53.     On November 11, 2024, Novus, on behalf of the Master Fund, submitted the Withdrawal Request to TRFX and 4XHUB. The Withdrawal Request required distribution of the full Platform Balance by January 30, 2025.

54.     The Withdrawal Request demanded withdrawal in full of all 2,250 trading accounts held in the name of the Master Fund, at that time totaling US$566,730,000.

## B.     BVI and Hong Kong Enforcement Steps

55.     Payment was not made by the date stipulated in the Withdrawal Request, January 30, 2025. By letter dated January 23, 2025, TRFX stated that it had initially projected payment on January 20, 2025, however attributed the delay to an anti-money laundering investigation in Hong Kong while also stating that the monies held for the Master Fund remained securely with the brokers and trading would continue.

56.     On January 27, 2025, Novus informed investors that the Debtor and the Cayman Entities could no longer operate in the normal course and that wind-down steps were being taken.

57.     On January 31, 2025, the Cayman Entities resolved to suspend redemptions and payment of redemption proceeds with immediate effect.

58.     Following the continuing non-payment, statutory demands were served on February 17, 2025, on the BVI and Hong Kong entities.

59.     Given TRFX's continued failure to repay the Master Fund, on February 17, 2025, the Master Fund served a statutory demand (the "BVI Statutory Demand") on TRFX (BVI) in the amount of US$26,821,550.97 (being cash sums believed to be in the Master Fund's accounts and the sum which was supposed to be paid on January 20, 2025). The Master Fund also served a statutory demand (the "Hong Kong Statutory Demand") on Tech RealFX Limited (Hong Kong) ("TRFX HK").

11

60.    On February 28, 2025, TRFX filed an application with the BVI Court seeking orders that the BVI Statutory Demand be set aside (the "Set Aside Application"), supported by an affirmation signed by Mr. Tan dated February 28, 2025. The grounds for the Set Aside Application were that:

    i.    the debt payable was disputed as the relevant agreements were executed by Mr. Chong who did not have authority to do so;

    ii.    certain correspondence and third-party broker statements provided by Mr. Chong and relied upon by the Master Fund were forged;

    iii.    the debt was not payable because the requisite notice period had not elapsed since the service of the BVI Statutory Demand;

    iv.    that there was no evidence of transfer of funds from the Master Fund, and

    v.    the parties had agreed to arbitrate any disputes.

61.    Correspondence was exchanged between Ogier, Cayman legal counsel for the Debtor and the Cayman Entities, on March 7, 2025, and Appleby (then counsel for TRFX), which reasserted similar issues.

62.    On March 21, 2025, the Set Aside Application was discontinued.

63.    Then, on June 26, 2025, the BVI Proceedings were commenced by the Debtor and the Cayman Entities in relation to the Platform Balance.

64.    On November 10, 2025, TRFX filed its defense in relation to the BVI Proceedings (the "Defense"). In broad terms, TRFX disputes the authenticity or authority underlying key documents, denies receipt or custody of client monies, and advances a materially different account of the trading history and balances.

65.    The BVI Proceedings remain ongoing.

**C.    Liquidation of the Cayman Entities**

66.    On January 13, 2026, the Cayman Entities were placed into voluntary liquidation by special resolutions passed by the voting shareholder of each respective company.

67.    Subsequently, on March 6, 2026, the Grand Court of the Cayman Islands (the "Grand Court") ordered that the winding up of the Cayman Entities be continued under the supervision of the Grand Court, and that Luke Furler and Tan Kim Han (Joffrey), both of Quantuma (Singapore) Pte Ltd, and Owen Walker of R&H Restructuring (Cayman) Ltd, be appointed as Joint Official Liquidators of the Cayman Entities (the "JOLs").

68.    With regard to the disputes arising as a result of the Defense, the Debtor and the JOLs sought an extension to the deadline for the claimants' response, which was subsequently agreed, and the deadline has been extended by three months to June 8, 2026 (subject to further extensions or orders).

69.    Since those appointments, the JOLs have been engaged in securing books and records, issuing preservation notices, liaising with service providers and counterparties, and coordinating counsel across the United States, Cayman, the British Virgin Islands, and Hong Kong.

## D.    Appointment of the CRO

70.    As set out in the General Partner Resolution, having regard to the ongoing BVI Proceedings, which presently represent the Debtor's principal prospective asset and recovery route, the General Partner understood there to be material uncertainty as to the Debtor's ability to continue operating as a going concern. In the absence of recoveries from TRFX or related claims in the near term, the General Partner did not consider there to be any realistic prospect of the Debtor resuming ordinary withdrawal processing or investor distribution in the interim.

71.    The General Partner considers that the Debtor's present assets, liabilities, liquidity position and stakeholder position are uncertain and that it is in the best interests of the Debtor, and

13

its creditors, limited partners and other interested parties, that a voluntary petition be filed seeking relief under the provisions of Chapter 11.

72.     The General Partner consulted with its members and determined that it is necessary and advisable to appoint an experienced restructuring and insolvency professional as CRO and appointed me in this regard.

73.     External funding is necessary to support the preservation, investigation, restructuring and recovery process, which may be raised within such Chapter 11 proceedings.

74.     The Debtor believes that, under the protection of this Court, it will be able to propose a confirmable chapter 11 plan.

**The Debtor's Liabilities and Assets**

**A.     The Debtor's Urgent Need to Preserve Claims**

75.     The JOLs are investigating a potential professional negligence and/or breach of contract claim against Deloitte arising from audit work performed in respect of the Debtor and the Cayman Entities for 2022 and 2023 ("Potential Audit Claims").

76.     On current information, there is a sufficient basis to investigate whether the audit work adequately verified balances reported as held with brokers or through the associated material, which are necessary before any final view can responsibly be taken as to merits, parties and quantum.

77.     The 2022 audit engagement letter, which is for the Debtor and the Cayman Entities, is dated March 6, 2023, and was signed on March 19, 2023 (the "Engagement Letter"). The unqualified auditor's reports for the Debtor and each of the Cayman Entities for the year ended December 31, 2022, were issued on March 24, 2023 (the "2022 Audits"). The unqualified auditor's reports for the year ended December 31, 2023, the audit reports for 2023, were issued on May 16,

14

2024 (the "2023 Audits"). The 2022 Audits and 2023 Audits were completed, however the audits for 2024 were not completed.

78.     The dispute resolution section within the Engagement Letter requires that disputes be settled by binding arbitration to be held in New York, New York.

79.     I am advised that in accordance with Bankruptcy Code § 108, given that the applicable limitations period for the 2022 Audits will not have expired before the date of this petition, the Debtors will have additional time to investigate the Potential Audit Claims.

80.     Preserving the Potential Audit Claims is one important reason the Debtor is seeking immediate protective relief.

**B.     Discovery and Related Relief**

81.     Notably, some of the claims and records relevant to the Debtor either arise in the U.S. or are likely to require U.S. court assistance to be effectively pursued. In particular, the Debtor may need to obtain books and records, audit workpapers, communications and other information from U.S.-based persons or entities.

82.     The Debtor and the Cayman Entities are pursuing recovery of the Platform Balance in a combined effort given that investor monies from all entities were deployed into the same trading structure. Accordingly, U.S. relief will assist in coordinating evidence gathering and prosecution of overlapping or common claims on a pooled basis, rather than through duplicative entity-by-entity actions.

83.     The Chapter 11 process will provide a controlled framework from which the Debtor and the Cayman Entities can undertake coordinated steps as to discovery, funding and recovery planning while reducing the risk of fragmented stakeholder action. This is particularly relevant as

15

the investments in each of the Debtor and Cayman Entities were routinely invested into the same trading counterparties and platform.

### C.      The Debtor has Lost its Purpose

84.      Apart from the immediate need to preserve records, stabilize control and protect time-sensitive claims, I also consider that the Debtor has suffered a practical loss of purpose or substratum. The Debtor was established as the U.S. feeder vehicle in a master-feeder structure, with the commercial purpose of receiving U.S. investor capital and deploying it through the Master Fund into the underlying trading strategy.

85.      The underlying structure has materially broken down. The Master Fund is in liquidation, the Debtor's principal value is tied to a disputed and presently unrecovered upstream position, and the Debtor is not in a position to carry on the ordinary investment, redemption and distribution functions for which it was formed.

86.      In these circumstances, there is at least serious doubt whether it remains reasonably practicable for the Debtor to continue its original business in conformity with the Partnership Agreement, and Chapter 11 is therefore being sought as a controlled mechanism to preserve assets and claims and implement an orderly recovery process.

87.      The Debtor's post-filing work will need to proceed across several jurisdictions and workstreams in parallel. In the United States, the focus is expected to be on securing effective control of the Debtor, preserving claims, and using available restructuring and discovery tools. In Cayman and the British Virgin Islands, the immediate work includes coordination with the supervised liquidations and progression of the BVI Proceedings. In Hong Kong, targeted disclosure or preservation steps may be directed to banks, trust providers, brokers, and other third

parties. In Malaysia, including Labuan, the work is presently focused around 4XHUB-related records and regulatory engagement.

88. We are continuing engagement with regulators and third-party record holders. Those efforts include engagement with the Labuan Financial Services Authority in relation to 4XHUB and with the BVI Financial Services Commission in relation to TRFX-related issues, together with ongoing or contemplated outreach to brokers, trust companies, banks, the administrator, former counsel, and the auditor. Further turnover requests, confirmations, and preservation steps remain necessary and that, in some cases, formal authority or court process may be required.

89. Chapter 11 is also intended to allow the Debtor to work in a coordinated way with the Cayman liquidations rather than on a fragmented basis. The present materials describe overlapping claims, overlapping service providers and custodians, common questions about fund flows and custody, and a need for coordinated funding, stakeholder communication, evidence handling, and recovery planning. In my view, that coordination is practically important because the same core records and counterparties bear on the Debtor's position and on the liquidators' work in respect of the Cayman Entities.

## CONCLUSION

90. The Debtor believes that under the protection of this Court, it will be able to maximize the value of its assets for the benefit of its creditors and other stakeholders.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 24, 2026



Luke Furler

17