# CREDIT AGREEMENT

CREDIT AGREEMENT dated as of _______ ___, 2026 (as amended, restated, supplemented or otherwise modified from time to time, this "Agreement") among the Litigation Trust, a New York statutory trust, established through the Litigation Trust Agreement (as defined below) ("Borrower"), and Cigno Holdings LLC (the "Lender"). The Term Loan Commitment of the Lender as of the date hereof is set forth on Schedule 1 hereto.

In consideration of the mutual agreements herein contained, the parties hereto agree as follows:

## SECTION 1 DEFINITIONS; INTERPRETATION.

1.1 Definitions. When used herein the following terms shall have the following meanings:

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Agreement" has the meaning set forth in the introductory paragraph hereof.

"Bankruptcy Code" means Title 11 of the United States Code entitled "Bankruptcy," as now or hereinafter in effect, or any successor statute thereto.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York.

"Borrower" has the meaning set forth in the introductory paragraph hereof.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks in New York, New York are authorized or required by law to close.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Confirmation Order" has the meaning set forth in the Plan.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Debt" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such

Person under conditional sale agreements relating to property acquired by such Person, (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (e) all Debt of others secured by (or for which the holder of such Debt has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Debt secured thereby has been assumed, (f) all Guarantees by such Person of Debt of others, (g) all Capital Lease Obligations of such Person, (h) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty and (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.

"Default" means the occurrence or existence of any one or more of the events described in Section 7.1, which, if continued uncured, would with the passage of time or the giving of notice or both, constitute an Event of Default.

"Dollar" and $ mean lawful money of the United States of America.

"Effective Date" has the meaning set forth in the Plan.

"Eligible Costs and Expenses" means the reasonable and documented fees, costs and expenses of Borrower in connection with pursuing the Litigation Trust Assets, administering Borrower, managing the Litigation Trust Assets and distributing the Litigation Trust Proceeds in accordance with this Agreement and the Litigation Trust Agreement.

"Exit Facility" means the Credit Agreement dated as of ___________ __, 2026, among the Borrower and the Lenders (as defined therein) from time to time party thereto (as amended, restated, supplemented or otherwise modified from time to time).

"Event of Default" means any of the events described in Section 7.1.

"Funding Fee" means, with respect to the Lender, an amount equal to 0.235 times (or 23.5%) of the principal amount of the Term Loan advanced to Borrower by the Lender.

"GAAP" shall mean generally accepted accounting principles set forth as of the relevant date in the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the United States of America accounting profession), including, without limitation, any Accounting Standards Codifications, which are applicable to the circumstances as of the date of determination.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Debt or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Debt or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the

primary obligor so as to enable the primary obligor to pay such Debt or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Debt or other obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Lien" means, with respect to any Person, any security interest granted by such Person (or any interest imposed by law) in any real or personal property, asset or other right owned or being purchased or acquired by such Person which secures payment or performance of any obligation and shall include any mortgage, lien, encumbrance, charge or other security interest of any kind, whether arising by contract, as a matter of law, by judicial process or otherwise.

"Litigation Trust Accounts" means one or more accounts in which Litigation Trust Proceeds are held, a list of which shall be provided to the Lender upon execution hereof and supplemented or amended in writing to the Lender by the Borrower from time to time.

"Litigation Trust Agreement" means that certain Litigation Trust Agreement dated as of ____________ ___, 2026, among the Litigation Trustee and Mars FX US LP.

"Litigation Trust Assets" has the meaning set forth in the Plan.

"Litigation Trust Proceeds" has the meaning set forth in the Litigation Trust Agreement (which, for the avoidance of doubt, shall be net of any amounts payable by the Litigation Trust in respect of the pursuit or recovery of such proceeds).

"Litigation Trustee" has the meaning set forth in the Litigation Trust Agreement.

"Material Adverse Effect" means the effect of any event, condition, circumstance or contingency that, taken alone or in conjunction with other events, conditions, circumstances or contingencies has had or would reasonably be expected to have a material adverse effect on (a) the property, operations or condition (financial or otherwise) of the Borrower, taken as a whole, (b) the ability of the Borrower to perform its material payment obligations under this Agreement when due or (c) the validity or enforceability of this Agreement or the rights and remedies of the Lender thereunder.

"Obligations" means all liabilities, indebtedness and obligations (monetary or otherwise) of Borrower owing to the Lender under (i) this Agreement (including, without limitation, the unpaid principal amount of the Term Loan and the Lender's Funding Fee) or (ii) any other document or instrument executed in connection with this Agreement.

"Permitted Liens" means the following encumbrances: (a) Liens for taxes or assessments or other governmental charges not yet due and payable or which are being contested in accordance with Section 5.2, (b) Liens on any Litigation Trust Accounts in favor of the financial institutions at which such accounts are held in respect of customary fees and expenses or otherwise arising by operation of law, (c) Liens consisting of judgment or judicial attachment liens with respect to judgments against the Litigation Trust or the Litigation Trustee (for which the Litigation Trust Assets may be subject for satisfaction) the existence of which do not constitute an Event of Default, and (d) other involuntary Liens not otherwise permitted hereunder securing obligations in an aggregate amount not to exceed $250,000.

"Person" means any natural person, corporation, partnership, trust, limited liability

company, association, governmental authority or unit, or any other entity, whether acting in an individual, fiduciary or other capacity.

"Plan" means the *First Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code of Mars FX US LP*, dated August 4, 2026 (as the same may be amended, supplemented or otherwise modified from time to time in accordance with the terms and provisions thereof and including the Plan Supplement).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, employees, agents, trustees, Controlling Persons and advisors of such Person and of each of such Person's Affiliates.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, trust or other entity of which (or in which) more than 50% of the outstanding voting securities or other equity interests are owned, directly or indirectly, by such Person.

"Term Loan" has the meaning set forth in Section 2.1.

"Term Loan Commitment" means, with respect to the Lender, the amount set forth opposite the Lender's name on Schedule 1 hereto, as such amount may be reduced from time to time pursuant to the terms of this Agreement. For the avoidance of doubt, the Term Loan Commitment includes a total of $150,000 funded to Mars FX US LP prior to its filing of a case under chapter 11 of the Bankruptcy Code.

1.2 Interpretation. In the case of this Agreement, (a) the meanings of defined terms are equally applicable to the singular and plural forms of the defined terms; (b) Annex, Exhibit, Schedule and Section references are to this Agreement unless otherwise specified; (c) the term "including" is not limiting and means "including but not limited to"; (d) in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding", and the word "through" means "to and including"; (e) unless otherwise expressly provided in this Agreement, (i) references to agreements and other contractual instruments shall be deemed to include all subsequent amendments, restatements and other modifications from time to time made thereto, but only to the extent such amendments, restatements and other modifications are not prohibited by the terms of this Agreement, and (ii) references to any statute or regulation shall be construed as including all statutory and regulatory provisions amending, replacing, supplementing or interpreting such statute or regulation.

**SECTION 2 TERM LOAN FACILITY.**

2.1 Term Loan Commitment. On and subject to the terms and conditions of this Agreement, the Lender agrees to make a loan to Borrower (a "Term Loan") on the Effective Date in an amount equal to the Lender's Term Loan Commitment.

2.2 Non-Interest Bearing Obligations. The Obligations shall be non-interest bearing.

2.3 Payment Free of Taxes. Any and all payments by or on account of any obligation of the Borrower under this Agreement shall be made without deduction or

withholding for any taxes, except as required by applicable law. All such withheld amounts that are paid over by the Borrower to the applicable taxing authority shall be treated as delivered to the applicable Lender. If the Lender is entitled to an exemption from or reduction of withholding Tax with respect to payments made under this Agreement it shall deliver to the Borrower, at the time or times reasonably requested by the Borrower, such properly completed and executed documentation reasonably requested by the Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding, including executed copies of IRS Form W-9 or applicable IRS Form W-8.

2.4 Conversion into Exit Facility. Upon execution of the Exit Facility, the Obligations outstanding under this Agreement (being the principal amount of the Term Loan together with the Funding Fee) shall be satisfied and discharged by the conversion thereof into a Term Loan Commitment under the Exit Facility in an amount equal to the aggregate Obligations then outstanding, and the Lender shall thereupon become a Lender under the Exit Facility on the terms set forth therein. Upon such conversion taking effect, this Agreement shall automatically terminate in accordance with Section 8.16.

**SECTION 3 CONDITIONS PRECEDENT.**

3.1 Term Loan. The obligation of the Lender to make the Term Loan is subject to the following conditions precedent:

(a) Effective Date of the Plan. The Effective Date (as defined in the Plan) shall have occurred in accordance with the terms and conditions in the Plan and in accordance with the provisions of the Confirmation Order (excluding the funding of the Litigation Trust Accounts with the proceeds of the Term Loan); and

(b) Credit Agreement. This Agreement shall have been executed by Borrower and the Lender.

(c) Representations and Warranties. The representations and warranties of Borrower set forth in this Agreement shall be true and correct in all material respects; and

(d) No Event of Default. No Event of Default shall have occurred and be continuing.

**SECTION 4 REPRESENTATIONS AND WARRANTIES**.

To induce the Lender to enter into this Agreement and to induce the Lender to make the Term Loan, Borrower represents and warrants to the Lender that:

4.1 Organization. Borrower is a [statutory trust validly existing and in good standing under the laws of the State of New York].

4.2 Validity; Binding Nature. This Agreement is the legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms, subject to bankruptcy, insolvency and similar laws affecting the enforceability of creditors' rights generally and to general principles of equity.

4.3 Effective Date. The Effective Date (as defined in the Plan) has occurred in

accordance with the terms and conditions in the Plan and in accordance with the provisions of the Confirmation Order (excluding the funding of the Litigation Trust Accounts with the proceeds of the Term Loan).

4.4 Authorization. The execution, delivery and performance of this Agreement has been duly authorized by all necessary action on the part of the Borrower.

4.5 Default. No Default or Event of Default has occurred and is continuing.

**SECTION 5 AFFIRMATIVE COVENANTS**.

Until the Obligations (other than contingent obligations not then due and payable) shall have been paid in full in cash or satisfied and discharged by conversion pursuant to Section 2.4, Borrower agrees that it will:

5.1 Maintenance of Existence. Maintain and preserve its existence and good standing as a statutory trust in the State of New York.

5.2 Compliance with Laws; Payment of Taxes and Liabilities. (a) Comply in all material respects with all applicable laws, rules, regulations, decrees, orders, judgments, licenses and permits, except to the extent that failure to comply therewith would not, in the aggregate, reasonably be expected to have a Material Adverse Effect, and (b) timely prepare and file all required tax returns and pay, prior to delinquency, all taxes and other governmental charges against it or any of its property, as well as claims of any kind which, if unpaid, could become a Lien on any of its property; provided that the foregoing shall not require Borrower to pay any such tax or charge so long as (x) it shall contest the validity thereof in good faith by appropriate proceedings and shall set aside on its books adequate reserves with respect thereto in accordance with GAAP or (y) the aggregate amount of all such unpaid taxes or charges does not exceed $25,000 and the failure to effect such payment would not reasonably be expected to have a Material Adverse Effect.

5.3 Books and Records. Keep its books and records in accordance with sound business practices.

5.4 Further Assurances. Upon request of the Lender, duly execute and deliver, or cause to be duly executed and delivered, to the Lender such further instruments and do and cause to be done such further acts as may be necessary or proper in the reasonable opinion of the Lender to carry out more effectively the provisions and purposes of this Agreement.

5.5 Notice of Certain Events. The Borrower shall furnish or cause to be furnished to the Lender:

(a) notice, as soon as practicable and, in any event, within five calendar days after the Borrower has knowledge of the occurrence of a Default or an Event of Default; and

(b) with reasonable promptness, such other information and data with respect to the Borrower's financial position as from time to time may be reasonably requested by the Lender.

**SECTION 6 NEGATIVE COVENANTS**.

Until the Obligations (other than contingent obligations not then due and payable) shall have been paid in full in cash or satisfied and discharged by conversion pursuant to Section 2.4, Borrower agrees that it will:

6.1 Debt. Not create, incur, assume or suffer to exist any Debt, except (a) Obligations under this Agreement, (b) Debt arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business, (c) Debt representing any taxes to the extent such taxes are being contested in good faith in appropriate proceedings and the Borrower is in compliance with Section 5.2 with respect thereto, (d) so long as no Event of Default has occurred and is continuing, additional Debt of the Borrower in an amount not to exceed $10,000,000 solely for payment of Eligible Costs and Expenses, which Debt shall (i) be unsecured, and (ii) be subject to subordination provisions (in form and substance reasonably satisfactory to the Lender) subordinating such Debt in right of payment to the payment in full or satisfaction and discharge of the Obligations (other than contingent obligations not due and payable at the time of such payment), (e) Debt incurred pursuant to a litigation funding arrangement, provided that repayment of such Debt shall be subordinated to the payment or satisfaction and discharge of the Obligations and (f) Debt created, incurred or assumed, or with respect to which the Borrower otherwise becomes liable, with the prior written consent of the Lender.

6.2 Liens. Not create or permit to exist any Lien on the Litigation Trust Assets or any of its other property or assets (whether now owned or hereafter acquired), except for Permitted Liens.

6.3 Modification of Organizational Documents. Not permit the Litigation Trust Agreement to be amended, modified or waived in a manner materially adverse to the Lender, except (a) to the extent expressly contemplated under the Litigation Trust Agreement and/or Plan, or (b) in accordance with the provisions of Section 10.1 of the Litigation Trust Agreement (as in effect on the date hereof).

6.4 Borrower's Activities. Not engage in any activities explicitly prohibited by the Litigation Trust Agreement as in effect on the date hereof.

6.5 Mergers; Consolidations. Not be a party to any merger or consolidation.

6.6 Subsidiaries. Not establish or acquire any Subsidiary.

6.7 Use of Proceeds. Not use the proceeds of the Term Loan for any purposes other than the payment of Eligible Costs and Expenses. The Lender shall not be required to monitor or verify the application of any such proceeds or payments.

**SECTION 7 EVENTS OF DEFAULT; REMEDIES.**

7.1 Events of Default. Each of the following shall constitute an Event of Default under this Agreement:

(a) Non-Compliance with Agreement. (i) Failure by Borrower to comply

with or to perform any covenant set forth in Sections 5.1 or 6 and continuance of such failure for ten (10) Business Days after Borrower's knowledge thereof or (ii) failure by Borrower to comply with or to perform any other provision of this Agreement applicable to it (and not constituting an Event of Default under any other provision of this Section 7.1) and continuance of such failure for ten (10) Business Days after Borrower's knowledge thereof.

(b) Insolvency. The Borrower shall be insolvent or unable to pay any of its debts as they mature.

(c) Involuntary Bankruptcy; Appointment of Receiver, etc.

(i) If an involuntary case seeking the liquidation or reorganization of the Borrower under Chapter 7 or Chapter 11 of the Bankruptcy Code or any similar proceeding shall be commenced against the Borrower under any other applicable law and any of the following events occur: (A) the Borrower consents to the institution of the involuntary case; (B) the petition commencing the involuntary case is not timely controverted; (C) the petition commencing the involuntary case is not dismissed within sixty (60) calendar days of its filing; or (D) an order for relief shall have been issued or entered therein; or

(ii) A decree or order of a court shall have been entered for the appointment of a receiver, liquidator, sequestrator, custodian, trustee or other officer having similar powers to take possession of all or a substantial portion of the property or to operate all or a substantial portion of the business of the Borrower.

(d) Voluntary Bankruptcy; Appointment of Receiver, etc. The Borrower shall institute a voluntary case seeking liquidation or reorganization under Chapter 7 or Chapter 11 of the Bankruptcy Code; or the Borrower shall file a petition, answer or complaint or shall otherwise institute any similar proceeding under any other applicable law, or shall consent thereto; or the Borrower shall consent to the conversion of an involuntary case to a voluntary case; or the Borrower shall consent or acquiesce to the appointment of a receiver, liquidator, sequestrator, custodian, trustee or other officer with similar powers to take possession of all or a substantial portion of the property or to operate all or a substantial portion of the business of the Borrower; or the Borrower shall make a general assignment for the benefit of creditors; or the Litigation Trustee adopts any resolution or otherwise authorizes action to approve any of the foregoing.

(e) Judgments and Attachments. The Borrower shall suffer any judgment, attachment, lien, execution or levy against the Litigation Trust Assets or any of its other property in any material amount which is not paid, discharged, released, bonded, stayed on appeal or otherwise fully satisfied within 30 days of the Borrower's actual knowledge thereof.

(f) Dissolution. Any order, judgment or decree shall be entered decreeing the dissolution of the Borrower, whether by voluntary or involuntary action.

(g) Representations; Warranties. Any representation or warranty made by Borrower herein is breached or is false in any material respect when made, and such failure shall result in an impairment of the ability of Borrower to perform its obligations hereunder.

(h) Failure to Comply With Litigation Trust Agreement, Plan or Confirmation Order. Failure by Borrower to comply in any material respect with the Litigation

Trust Agreement, the Plan or the Confirmation Order and such failure shall continue unremedied for a period of ten
(10) Business Days.

(i) Agreement. Borrower shall repudiate or deny in writing any portion of its liability or obligations for the Obligations.

7.2 Remedies. If any Event of Default described in Sections 7.1(c) and (d) shall occur, the Term Loan and all other Obligations shall become immediately due and payable, all without presentment, demand, protest or notice of any kind; and, if any other Event of Default shall occur and be continuing, the Lender may declare all or any part of the Term Loan and other Obligations to be due and payable, whereupon the Term Loan and other Obligations shall become immediately due and payable (in whole or in part, as applicable), all without presentment, demand, protest or notice of any kind. The Lender shall promptly advise Borrower of any such declaration, but failure to do so shall not impair the effect of such declaration.

**SECTION 8 MISCELLANEOUS.**

8.1 Amendments. No amendment, modification or waiver of, or consent with respect to, any provision of this Agreement shall in any event be effective unless the same shall be in writing and signed by Borrower and the Lender; provided that no such amendment, modification, waiver or consent shall, without the written consent of the Lender: (a) reduce or forgive the principal amount of the Term Loan or the Lender's Funding Fee; (b) release all or substantially all of the Obligations; or (c) change the definition of Funding Fee.

8.2 Notices. All notices hereunder shall be in writing (including facsimile or electronic mail transmission) and shall be sent to the applicable party at its address shown on Schedule 1 hereto (in the case of the Lender) or on the signature page hereto (in the case of the Borrower), or at such other address as such party may, by written notice received by the Borrower and the Lender, have designated as its address for such purpose. Notices sent by facsimile transmission or electronic mail shall be deemed to have been given when sent if sent during the regular business hours of the recipient; notices sent by mail shall be deemed to have been given three (3) Business Days after the date when sent by registered or certified mail, postage prepaid; and notices sent by hand delivery or overnight courier service shall be deemed to have been given when received. For purposes of this Section 8.2, the term "regular business hours of the recipient" shall mean and be interpreted to be any day between the hours of 8:00 am and 5:00 pm in the jurisdiction of the recipient that is not a Saturday, Sunday or legal holiday for which the recipient is not open for regular business.

8.3 Costs; Expenses. Borrower agrees to pay promptly following demand by the Lender all reasonable and documented out-of-pocket costs and expenses of the Lender (including the reasonable and documented out-of-pocket fees, charges and disbursements of one counsel) in connection with the Lender's enforcement of its rights and remedies under this Agreement upon an Event of Default.

8.4 Indemnification. The Borrower shall indemnify the Lender and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of (a) a single transaction and documentation

counsel for any Indemnitee and (b) such other local counsel and special counsel as may be required in the reasonable judgment of the Lender, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any other agreement or instrument contemplated hereby, the performance by the parties to this Agreement of their respective obligations thereunder or the consummation of the transactions contemplated hereby, (ii) any Term Loan or the use of the proceeds therefrom or (iii) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee; provided, further, that the aggregate liability of the Borrower under this Section 8.4 shall not exceed the Term Loan Commitment.

8.5 Payments Set Aside. To the extent that Borrower makes a payment or payments to the Lender and such payment or payments or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party in connection with any bankruptcy, insolvency or similar proceeding, or otherwise, then to the extent of such recovery, the obligation hereunder or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made.

8.6 Captions. Captions used in this Agreement are for convenience only and shall not affect the construction of this Agreement.

8.7 Nature of Remedies. All Obligations of Borrower and rights of the Lender expressed herein shall be in addition to and not in limitation of those provided by applicable law. No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

8.8 Counterparts. This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts and each such counterpart shall be deemed to be an original, but all such counterparts shall together constitute but one and the same Agreement. Receipt by telecopy or electronic transmission of any executed signature page to this Agreement shall constitute effective delivery of such signature page.

8.9 Severability. The illegality or unenforceability of any provision of this Agreement or any instrument or agreement required hereunder shall not in any way affect or impair the legality or enforceability of the remaining provisions of this Agreement or any instrument or agreement required hereunder.

8.10 Entire Agreement. This Agreement embodies the entire agreement and understanding among the parties hereto and supersedes all prior or contemporaneous agreements and understandings of such Persons, verbal or written, relating to the subject matter hereof and thereof.

8.11 Successors; Assigns. This Agreement shall be binding upon Borrower and the Lender and their respective successors and assigns, and shall inure to the benefit of Borrower and the Lender and the successors and assigns of Borrower and the Lender. No other Person shall be a direct or indirect legal beneficiary of, or have any direct or indirect cause of action or claim in connection with, this Agreement. No party hereto may assign or transfer any of its rights or obligations under this Agreement without the prior written consent of the other party hereto, except that the Lender may, without the prior written consent of Borrower: (a) assign all or any portion of its Term Loan and related Funding Fee to an Affiliate of the Lender (including, but not limited to, any fund or account advised by the same manager or investment advisor); provided that the Lender shall provide Borrower with prior written notice of such assignment, specifying the name of the assignee, the principal amount assigned, and the corresponding Funding Fee amount; and (b) pledge or grant a security interest in its rights under this Agreement to secure the obligations of the Lender.

8.12 Governing Law. THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO THE CONFLICT OF LAW PRINCIPLES THEREOF THAT WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.

8.13 Forum Selection; Consent to Jurisdiction. ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT, SHALL BE BROUGHT AND MAINTAINED EXCLUSIVELY IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK. EACH PARTY HERETO IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS BY REGISTERED MAIL, POSTAGE PREPAID, OR BY PERSONAL SERVICE WITHIN OR WITHOUT THE STATE OF NEW YORK. EACH PARTY HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

8.14 Waiver of Jury Trial. EACH OF BORROWER AND THE LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT, AND ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION HEREWITH OR THEREWITH OR ARISING FROM ANY LENDING RELATIONSHIP EXISTING IN CONNECTION WITH ANY OF THE FOREGOING, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.

8.15 Survival. All covenants, agreements, representations and warranties made by Borrower in this Agreement and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the Lender and shall survive the execution and delivery of this Agreement and the making of the Term Loan, regardless of any investigation made by the Lender or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall

continue in full force and effect as long as the principal of the Term Loan or other amount payable under this Agreement is outstanding and unsatisfied. The provisions of Section 8.4 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Term Loan, the expiration or termination of the Term Loan Commitment or the termination of this Agreement or any provision hereof solely to the extent of any actions commenced prior to or pending at the time of such repayment, expiration or termination, as applicable, for which Section 8.4 applies.

8.16 Termination. When all of the Obligations (including the Funding Fee) shall have been paid in full in cash or satisfied and discharged by conversion pursuant to Section 2.4 (other than contingent indemnification obligations for which no claim has been made), this Agreement and all obligations (other than those expressly stated to survive the termination of this Agreement) of the Lender and the Borrower hereunder shall automatically terminate.

8.17 Confidentiality. The Lender agrees to maintain the confidentiality of all non-public information received from the Borrower or the Litigation Trustee relating to the Borrower, the Litigation Trust, the Litigation Trust Assets, or the transactions contemplated by this Agreement ("Confidential Information"), except that Confidential Information may be disclosed (a) to the Lender's Affiliates and its and their respective directors, officers, employees, agents, advisors and representatives (provided that the Persons to whom such disclosure is made are informed of the confidential nature of such Confidential Information and agree or are instructed to keep such Confidential Information confidential on terms substantially similar to this Section 8.17), (b) to the extent required or requested by any governmental authority, regulatory body, or self-regulatory organization, (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any assignee of or participant in, or any prospective assignee of or participant in, any of the Lender's rights under this Agreement (provided that such Person agrees in writing to be bound by the terms of this Section 8.17), (e) with the prior written consent of the Borrower, or (f) to the extent such Confidential Information becomes publicly available other than as a result of a breach of this Section 8.17. The obligations of the Lender under this Section 8.17 shall survive for a period of two (2) years following the termination of this Agreement.

The parties hereto have caused this Agreement to be duly executed and delivered by their duly authorized officers as of the date first set forth above.

Litigation Trust, as Borrower

By:

______

Name:
Title:

Address for Notices:

Cigno Holdings LLC, as the Lender

By: _______
Name:
Title:

Address for Notices: [As set forth on Schedule 1]

**SCHEDULE 1**

**LENDER AND TERM LOAN COMMITMENT**

| Lender Name | Term Loan Commitment | Funding Fee Commitment | Wire Transfer / Payment Details | Address for Notices |
|---|---|---|---|---|
| Cigno Holdings LLC | US$500,000 | US$117,500 | [To be completed] | [To be completed] |